FILED

2005 Mar-09  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **WILBERT PRICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV-03-PT-2785-M** |
| | ) | |
| **M&H VALVE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant M&H Valve Company's Motion for Summary Judgment, filed on June 28, 2004, and  Supplemental Motion for Summary Judgment, filed on February 4, 2005.

## FACTS[1] AND PROCEDURAL HISTORY

### I.    Introduction and Procedural History.

Defendant M&H Valve Company ("M&H Valve") manufactures and sells valves and hydrants for commercial use.  (Baldwin Decl., ¶ 2).[2]  Plaintiff Wilbert Price ("Price") was first hired by M&H Valve in 1972 to work on the yard crew in M&H Valve's foundry.  (Price Depo., p. 96).  At all relevant times, Price was represented by the Glass, Molders, Pottery, Plastics & Allied Workers International Union, Local Union 324.  (Baldwin Decl.,  ¶ 3).  Except for a few short periods of layoffs, Price has continued to work at the company to the present.  (Price Depo., pp. 96-101).  In addition to working on the yard crew and in the foundry, Price worked in the

---

[1] The court notes where facts appear disputed.

[2] Roger Baldwin ("Baldwin") is currently the Personnel Manager at M&H Valve.

1

cleaning room as a grinder, in the machine shop (where he ran a drill and the B through G machines), as a janitor, as a coremaker in the core room, and in the electric melt department. (*Id.* at 96-100).[3]  For the year or so prior to his deposition taken on April 15, 2004, plaintiff operated B through G machines in the machine shop. (*Id.* at 98, 100).

Price was formally educated through the 11th grade and then obtained a GED. (Price Depo., p. 88).  Furthermore, Price has held the position of committeeman in the local union which forms the bargaining unit with M&H Valve. (*Id.* at 26).  Price testified that he believes he is qualified to be a supervisor anywhere at M&H Valve based on his prior experience in working virtually all over the plant as well as the fact that he has trained other employees at M&H Valve. (Price Dep., pp. 36-37).  Price also trained through a four-year apprenticeship to become a Journeyman Coremaker responsible for making the smelting cores, the core bodies, and operating all of the coremaking machines. (*Id.* at 55-56).  As a Journeyman Coremaker, Price trained many employees on various coremaking machines. (*Id.* at 18, 26).  M&H Valve has expressed no complaints about Price's ability to train. (Baldwin Depo., p. 61).

Baldwin testified that supervisors at M&H Valve are salaried employees who supervise hourly employees to ensure that they perform their jobs and that their department is operated efficiently and effectively. (Baldwin Decl., ¶ 4).  Supervisors, according to Baldwin, are also responsible for ensuring that hourly workers comply with company rules and may discipline employees who stray from such rules. (*Id.*)  Supervisors, unlike hourly workers, are not members of the bargaining unit and the terms and conditions of their employment are not governed by the

---

[3] Moreover, plaintiff notes, he worked on the incinerator, in the paint department, as a maintenance helper, and on a Laempe coremaking machine. (Price Depo., 98-101).

2

union's collective bargaining agreement.  (*Id.*)  Moreover, Baldwin stated, supervisors are typically paid more than hourly workers and are entitled to different benefits than those offered to hourly workers.  (*Id.*)  Baldwin further asserted that supervisors are evaluated differently than hourly workers and are disciplined under different guidelines.  (*Id.*)

Baldwin confirmed that prior to implementation of a conciliation agreement, M&H Valve had no written criteria for selecting supervisors and leadmen.  Instead, Baldwin stated, the line management would suggest certain employees for particular supervisory positions.  Management would then check the candidate's attendance and disciplinary records.  Price's personnel file indicates a near-perfect attendance record and "virtually no" disciplinary actions against him. Baldwin did not know if from November 2000 onward Price was ever considered for a supervisory position at the company, except for the testing in 2003 (discussed below).  Baldwin confirmed that plaintiff had signed the bid list for the one supervisory position posted since the E.E.O.C. conciliation agreement.  Baldwin also confirmed that Price had no disciplinary problems that would knock him out of consideration for a supervisory position.  Additionally, Baldwin had never heard complaints about plaintiff's performance at the company.  M&H Valve also hired personnel to fill supervisory positions from outside of the then current company roster.

Prior to October 2002, M&H Valve gave no notice to current employees when it was seeking to fill supervisory positions.  (Baldwin Depo., pp. 36-39).  According to Price, notice was only given after a supervisory position had been filled.  Price asserts that seniority was ignored at M&H Valve as employees of 25-30 years, such as him, were being overlooked in favor of 19-year olds.  Recently, M&H Valve has instituted a training program for employees wishing to be supervisors.  Now, in addition to an entrance test, seniority is one criteria used to

determine who is admitted to the training program and who is not.  Price has never held a

supervisory position at any job, including at M&H Valve.  (Price Depo., p. 95).  Furthermore,

Price has never held a leadman designation at M&H Valve.

In 1999, Price, along with 37 other African-American employees at M&H Valve filed a

union grievance because there were no African-American supervisors at the company.  (Price

Depo., pp. 18, 26).  Price filed an E.E.O.C. charge on May 1, 2001.[4]  On October 10, 2003, Price

filed a complaint in this action against the defendant alleging racial discrimination in violation of

---

[4] Price's E.E.O.C. charge alleged only race discrimination and stated as follows:

On or about February 10, 2001, and on a continuing basis, the above-named
employer has denied me the opportunity to apply for a position as a supervisor.  I
have been employed by the employer since November 1972, and my current
position is core maker in the Foundry Department.

Although I have objected to the employer's continuous failure to advertise vacant
supervisory positions, I have been given no reason for the employer's failure to
announce supervisory vacancies, or its failure to promote Blacks to supervisory
positions.  The employer's position is that no discrimination has occurred, but no
explanation is given.

I believe I have been discriminated against because of my race (Black) in violation
of Title VII of the Civil Rights Act of 1964, as amended.  White employees who
have less seniority and experience are promoted over comparably qualified Black
employees.

I believe the employer's practice of failing to announce vacancies for supervisory
positions, and its practice of selecting White employees for supervisory positions,
while failing to provide equal opportunity for Black employees to seek
advancement discriminates against Blacks as a class with respect to promotion.
Black employees are also subjected to racial harassment in the form of racial slurs,
jokes, and differences in treatment.  The employer is aware of these actions and
has taken no action to correct the racially derogatory slurs by its managers.

Title VII and Section 1981A.[5]  Count One (Race Discrimination) alleged the following: African-American employees are given a lower seniority status than Caucasian employees with the same hire date; defendant advanced and promoted Caucasian employees to higher paying, supervisory jobs but did not do so for plaintiff and other similarly situated African-American employees; plaintiff received lower wages than similarly situated white employees; defendant trained Caucasian employees for advancement but refused to provide the same or similar training for African-American employees; defendant hired Caucasian individuals for supervisory positions but did not do so for African-Americans; African-American employees are subjected to racial slurs, jokes, and differential treatment of which defendant is aware but "has taken little or no effort to correct such behavior"; defendant failed to offer promotion opportunities to its African-American employees while offering such opportunities to Caucasians; and defendant retaliated against plaintiff for failing to accept a conciliation offer.

Count Two (Claim for Interference of Contractual Rights because of Race) alleged that M&H Valve engaged in unlawful discrimination against plaintiff "with respect to discharge,[6] promotions, benefits, wages, hiring, pension, discipline and other terms and conditions of employment and, upon information and belief, ... has and has had a policy and custom, evidenced by an established pattern and practice executed by its agents and officials, of discriminating against black persons with respect to recruitment, hiring, compensation, promotions, discipline, discharge, pay, fringe benefits, pensions and other terms and conditions of employment."

_____

[5] In the complaint, plaintiff sought declaratory and injunctive relief, lost wages and benefits, liquidated and punitive damages, attorneys' fees and costs.

[6] Apparently plaintiff is still employed by the defendant.

5

During a January 18, 2005 hearing on this matter, Price's counsel was asked to clarify the exact claims Price is asserting in this action.  At that hearing, Price's counsel asserted that Price is alleging the following: (1) M&H Valve discriminated against Price by failing to promote him to the position of CNC Supervisor and instead awarding the position to Chuck Yeager in October 2000[7]; (2) M&H Valve's entrance exam for its supervisory training program, which Price failed, has a disparate impact on black employees[8]; and (3) M&H Valve retaliated against Price when it failed to discipline Wayne Gill after he allegedly made "racial slurs."[9]

## II.    Facts Relevant to Plaintiff's Failure-to-Promote Claims.

### A.    Facts Relevant to Plaintiff's Claim Regarding the CNC Supervisor Position Awarded to Chuck Yeager on October 29, 2000.

On October 29, 2000, M&H Valve awarded the position of CNC Supervisor to Chuck

---

[7] In his Response to defendants supplemental motion, Price raises another failure to promote claim regarding M&H Valve's hiring of Machine Shop supervisor Dean Nance in 2000-2001.

[8] In his Response, Price appears to restate this claim as based on failure to train rather than disparate impact.

[9] In his Response, Price raises two other retaliation claims.  Price asserts that M&H Valve retaliated against him for filing a union grievance and the E.E.O.C. Charge of Discrimination and for failing to accept a conciliation offer made by the company by promoting less experienced African-Americans instead of him.  Price further asserts that he was retaliated against in that he and other African-American, but not Caucasian, employees were questioned by M&H Valve's attorney regarding their beliefs that M&H Valve participated in racial discrimination.  Also in his Response, Price asserts another separate claim that he was subjected to racial slurs while working at M&H Valve.

In its final Reply, M&H Valve argues that, throughout this lawsuit, Price has refused to "pin down" the specific claims he is asserting in this action.  M&H Valve asserts that Price's attempts to change his claims in his final Response are "sanctionable."

Yeager ("Yeager").  Yeager testified that the term CNC refers to machines that are computer numerically controlled.  (Yeager Decl., ¶ 3).  According to Yeager, these machines involve the computerized control of machining tools for the purpose of manufacturing complex parts using a program written in computer code.  (*Id.*)  Yeager stated that CNC machines must be programed or "set up" before starting each different type of job the machine is supposed to perform.  (*Id.*)  Yeager asserted that some CNC Operators, particularly those with less experience on CNC machines, do not know how to perform these critical set-ups.  (*Id.*)  Other CNC operators, according to Yeager, know how to set up some machines but not others.  (*Id.*)  Yeager further testified that CNC set ups are difficult and a person usually requires at least 2-3 months to learn how to set up each machine.  (*Id.*)  Yeager stated that some employees take even longer to learn the workings of a machine and others are simply unable to learn how to do the set ups.  (*Id.*)

In the Fall of 2000, Yeager, then a CNC Operator at M&H Valve, became aware that a "machining" supervisor position in the Machine Shop on the second shift was vacant and had been vacant for several weeks.[10]  (Yeager Decl., ¶ 8).  Yeager testified that he believed he was qualified for the vacant position because of his previous experience as a supervisor and his knowledge of the CNC machines.  (*Id.*)  Yeager submitted his resume to Mike Fulmer ("Fulmer"), the Machine Shop Manager.  (*Id.*)  Fulmer testified that M&H Valve decided to award the position to Yeager because of his extensive knowledge of CNC machines, his over ten years of experience operating and setting up such machines, and his over four years of

---

[10] A "machining" supervisor supervises the operation of all of the machines in the Machine Shop, including the CNC machines.  (Yeager Depo, p. 24).  The other type of supervisor in the Machine Shop is the assembly supervisor, who supervises the assembly of valves and hydrants.  (Yeager Decl., ¶ 2)

supervisory experience over other CNC Operators.  (Fulmer Decl., ¶ 4).

Yeager testified that, prior to being hired by M&H Valve as a CNC Operator in 2000, he had approximately 10 years of experience in setting up and operating various types of CNC machines.  (Yeager Decl., ¶ 4).  At Haney Company, where Yeager worked immediately prior to working at M&H Valve, he served as a leadman for one year and as a supervisor for approximately three years.  (*Id.*)  As a leadman at Haney, Yeager stated, he supervised several employees while overseeing quality control and operating his own machine.  (*Id.*)  As a supervisor, Yeager was responsible for supervising approximately 10 CNC Operators.  (*Id.*)  During his time as both leadman and supervisor, Yeager testified, he knew how to set up and operate each of the 4-5 CNC machines at Haney.  (*Id.*)  Similarly, Yeager asserted that he knew how to set up each of the 5 CNC machines at Champion Pneumatic and LaSalle Machine, the two places he worked prior to Haney.  (*Id.*)

Price testified that before transferring to the Machine Shop, where the CNC machines are located, in January 2003, he last worked there sometime in or before 1981.[11]  (Price Depo., pp. 96-97, 99).  Plaintiff also stated that he has never held a supervisory position at any job, including his time at M&H Valve.  (Price Depo., p. 95).

**B.     Facts Relevant to Plaintiff's Claim Regarding the Machine Shop Supervisor Position Awarded to Dean Nance.**

Baldwin testified regarding the hiring of Dean Nance ("Nance") as follows:

> Q:     Do you know if the other one who may have been hired during that time, the year 2001, do you know if that individual was white or Caucasian or African-American or some other race?

---

[11] Price has not drawn the court's attention to any evidence indicating that he ever worked on a CNC machine.

A:     Well, I believe it (*sic*) would have been white.  I believe white.  There's – and there may be one that was hired – what I'm – the two – let me – let me just – I don't know what year it was, whether it was '00 or '01.  We – I believe we hired a white employee named Dean Nance as a supervisor.  And I think we also promoted from within in or around that time frame a supervisor named Yeager.

(Baldwin Depo., pp. 19-20).  However, Nance testified that he was hired on August 23, 1999.

(Nance Depo., p. 28).

## III.   Facts Relevant to Plaintiff's Retaliation Claims.

### A.     Facts Relevant to Plaintiff's Claim Regarding Defendant's Failure to Discipline Wayne Gill for Allegedly Making "Racial Slurs."

Price alleges that he was retaliated against by M&H Valve in June 2001 when the company failed to discipline Wayne Gill ("Gill")[12], a white supervisor, after Gill allegedly made "racial slurs" in a conversation with Steven Caruso ("Caruso"), a white Laempe machine operator.  According to Price, Gill made the comment after Price and other third shift core room employees filed a union grievance regarding a change in incentive pay.  Regarding the incident, Price testified as follows:

They changed our rates on the – in the core room.  And then this here guy was supposed to – Caruso supposed had to came (*sic*) on the core machine that we was working on and he approached Wayne and asked him that we couldn't make no money up there on the core machine.  That Hubbard and Price said that he couldn't make no money on the core machine.  And Wayne Gill made a statement to him saying that only reason they can't make no money up here and the only reason they filing a grievance is because they black.

(Price Depo., pp. 45-46).

On June 16, 2001 Caruso composed a handwritten statement regarding his conversation

---

[12] According to Price, Gill was a supervisor in the foundry department, and a decision maker regarding promotions in that department.

with Gill on June 13, 2001.  The relevant portion of Caruso's statement provides:

> I asked [Gill] about the grievances that had been filed and he replies that they (not mentioning any names) had no grounds for a grievance since the company has the right to set the rates.  He then smiles and said the only reason they made a grievance is because they were black.

On June 22, 2001 Gill submitted an unsigned statement recounting the conversation with Caruso.  This statement did not include any reference to the "because they were black" comment attributed to Gill by Caruso.  Baldwin investigated the incident after Price filed a grievance.  (Supp. Baldwin Decl., ¶ 3).  Baldwin stated as follows:

> In June 2001, I received a grievance from Wilbert Price regarding an alleged race-related statement allegedly made by Wayne Gill, a supervisor in the Machine Shop, to Steven Caruso, a Laempe operator.  After I received this grievance and a statement from Mr. Caruso, I investigated the grievance pursuant to M&H Valve's anti-harassment policy by first speaking with Mr. Gill.  Mr. Gill denied making the statement attributed to him by Mr. Caruso and provided me a statement to this effect. . . . Ultimately, based on my investigation and Gill's denial of what Caruso said, the Company found that there was no corroboration to Caruso's statement and ruled against Mr. Price's grievance.  Ultimately, the union representing Mr. Price agreed with the Company's position by not pursing the grievance.

(*Id.*)

### B.    Facts Relevant to Plaintiff's Claim Regarding Defendant's Promotion of Less Experienced African-Americans.

In January 1999, plaintiff (who was a union committeeman), along with 37 other African-American employees of defendant, signed a grievance presented to him by Jerry Summerlin ("Summerlin"), a fellow African-American hourly employee at M&H Valve and the chairman of the union local.  *(See* Price Depo., p. 24).  In this grievance, several black employees including Rodney Chatman ("Chatman") and Grady Calloway ("Calloway"), claimed that they were denied promotions to supervisory positions at M&H Valve because of their race.  (*Id.* at 24-25; Exhibit 1

10

to Baldwin Decl.).  Plaintiff testified that he signed the grievance because he believed he should have been considered for promotion to supervisory positions ultimately offered in 1997 or 1998 to three white men – Wayne Gill, Mike Haton, and James Putnam.

Ultimately, Summerlin, Chatman, and Calloway – three of the signatories to the January 1999 grievance, were promoted to supervisory positions.  Summerlin was promoted to Assembly Supervisor in the machine shop on June 10, 2002.  (*See* Baldwin Decl., ¶ 5).  According to Baldwin, Summerlin "was promoted based on his knowledge of the parts that we had at M&H and some demonstrated leadership capabilities that he had displayed, both internally and with the union."  Furthermore, Baldwin testified, Summerlin "developed an ability to express himself fairly well in terms of presenting his position to management" and to the union.  (*See* Baldwin Depo., pp. 31-32).

Calloway and Chatman were both promoted to Foundry Supervisor positions on July 1, 2002.[13]  Summerlin, Calloway, and Chatman were each promoted after M&H Valve interviewed a list of candidates recommended by other supervisors and managers, and these men were deemed to be the most qualified.  (*See* Baldwin Depo., pp. 33-35; Baldwin Decl., ¶ 5).  Further, defendant points out, Steve Minniefield, another African-American employee who signed the 1999 grievance, was given the leadman designation on his job in June 2001.

**C.    Facts Relevant to Plaintiff's Retaliation Claim Regarding Questioning by Defendant's Lawyer.**

---

[13] According to Baldwin, Calloway was promoted because of his familiarity with the foundry equipment and with production requirements and because he had demonstrated that he "was able to deal with people very well."  Chatman was allegedly promoted because he had been in the Marines, was mature, was familiar with the equipment, was well-spoken, and indicated that he was able to manage people and make decisions.  (*See* Baldwin Depo., p. 35).

Plaintiff has failed to point to any evidence concerning his claim that M&H Valve's attorney questioned him and other African-American employees about discrimination in the company.

**IV.    Facts Relevant to Plaintiff's Racial Slur Claims.**

In his Response, Price claims that, while employed at M&H Valve, he has been subjected to racial slurs, jokes and differences in treatment.  According to Price, M&H Valve was aware of these circumstances, but took little or no action to remedy them.  In support of this claim, Price points mainly to the same facts discussed above regarding Gill's alleged comment to Caruso. Price also points to his following deposition testimony:

> Q:    All right.  Now other than the incident where Mr. Wayne Gill allegedly said that to Mr. Caruso, has there ever been any other racial statement or slur or anything else said to you or about you during your employment at M&H Valve?
> A:    Yes.
> . . .
> Q:    What?
> A:    Well, this guy used to call – used to go around and holler and call me Sambo.
> Q:    Who is that?
> A:    He's white.
> Q:    Who is that?
> A:    Steelwell.
> Q:    Mr. Steelwell?
> A:    Uh-hun.
> Q:    And when did he do that?
> A:    Well, it was – it – well, it was – it was in the eighties.

(Price Depo., pp. 133-34).

**V.    Facts Relevant to Plaintiff's Disparate Treatment Claim Regarding the Entrance Exam to M&H Valve's Supervisory Training Program/Plaintiff's Failure to Train Claim.**

Finally, Price claims that M&H Valve discriminated against him by requiring applicants

to pass a standardized test to enter its newly-developed supervisory training program.  According to Price, this requirement has a disparate impact on African-American employees.

Baldwin testified that M&H Valve instituted its supervisor training program in July 2003. (Supp. Baldwin Decl., ¶ 4).  After Price and other African-American employees at M&H Valve filed charges of discrimination with regard to promotions, the training program was developed as part of its conciliation agreement with the E.E.O.C.  (*Id.*)  According to Baldwin, the charging parties, including Price, alleged that M&H Valve had traditionally "tapped the shoulders" of white employees to promote them to supervisory positions without giving such opportunities to African-American employees.  (*Id.*)  Baldwin stated that M&H Valve determined that one method of remedying this perceived inequity would be to institute a well-publicized supervisor training program to provide qualified employees (both black and white) who were interested in supervisory positions with an avenue to enhance the skills necessary for advancement.  (*Id.*)  After the program was developed, Baldwin asserted, M&H Valve provided the E.E.O.C. with a copy of the curriculum to be followed in the program.  (*Id.*)  This curriculum included training in leadership, quality control and time management.  (*Id.*)

To develop the supervisory training program, M&H Valve worked with Gadsden State Community College and Jacksonville State University.  (Supp. Baldwin Decl., ¶ 5).  According to Baldwin, Jacksonville State was primarily involved in developing the curriculum for the program.  (*Id.*)  Gadsden State, on the other hand, was involved in helping M&H Valve set up a test to determine whether individual applicants possessed the necessary academic skills (from both a communications and mathematical standpoint) to pass the training program and to function effectively as a supervisor once the program was completed.  (*Id.*)  Baldwin testified

that Joe Cavender ("Cavender"), the Director of Adult Education Services at Gadsden State, suggested the use of the Test of Adult Basic Education ("TABE") as a means of measuring the academic levels of the applicants in determining eligibility for the program. (*Id.*)

Cavender testified that the TABE is a norm-based examination used extensively throughout the United States, especially in adult education programs, to determine the approximate grade level of the person tested. (Cavender Decl., ¶ 3). Cavender further asserted that the TABE is one of only three tests the State of Alabama has approved for examining applicants for adult education classes who wish to obtain a GED. (*Id.*) The TABE tests language and spelling, mathematics, and reading. (*Id.*) According to Cavender, the purpose of the test is to evaluate an individual's academic strengths and weaknesses to determine what work must be done by the individual to obtain a GED. (*Id.*)

Baldwin testified that M&H Valve's management determined, based on their knowledge of the requirements of the supervisory positions within the company, that a 10th grade equivalency on the TABE would be a satisfactory level at which to begin the supervisory training program. (Supp. Baldwin Decl., ¶ 6). According to Baldwin, M&H Valve management believed that this requirement would eliminate candidates who lacked the educational skills to complete the intense nine-month training program. (*Id.*) The company's management, according to Baldwin, limited enrollment to those with a 10th grade testing level because, as supervisors, the participants would need to do basic calculations, read and understand company policies and procedures, write clear and concise memoranda, and provide clear and understandable directions to the workforce. Baldwin asserted that the cost of the program for the 15 students who enrolled was $24,000, and only 8 of the students completed the program. (*Id.*)

14

According to M&H Valve, Price took the TABE twice in an attempt to enter the supervisory training program.  On his first attempt on August 13, 2003, Price scored an average grade level of 3.8 on the three tested subjects.  On September 7, 2004, Price was re-tested and his average grade level was 4.5.

Relating to this disparate impact claim, Price further alleges that M&H Valve has failed to offer him training that has been offered to similarly situated Caucasian employees.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of explaining the basis of his motion.  *Celotex*, 477 U.S. at 323.  "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial."  *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'"  *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).  Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

15

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS[14]

### I.    Defendant's Motion.

#### A.    Plaintiff's Failure-to-Promote Claim Regarding the CNC Supervisory Position.

Defendant maintains that it is entitled to summary judgment on plaintiff's failure-to-promote claim regarding the CNC Supervisor position filled by Chuck Yeager in October 2000.

##### 1.    Plaintiff's Failure-to-Promote Claim is Time Barred.

Defendant notes that M&H Valve promoted Yeager to the CNC Supervisor position on October 29, 2000, and plaintiff did not file this lawsuit until October 10, 2003.[15] Accordingly, defendant argues, almost three years elapsed between the challenged decision and the filing of plaintiff's complaint. Therefore, defendant asserts, this claim is barred by the two-year statute of limitations that applies under § 1981 to this type of claim.

Defendant anticipates that plaintiff might argue that his claims under § 1981 are subject to

---

[14] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

[15] Plaintiff's E.E.O.C. charge filed on May 1, 2001 does not specifically address this position.

a four-year statute of limitations based on the Supreme Court's recent decision in *Jones v. R.R. Donnelley & Sons Co.,* 124 S.Ct. 1836 (2004).  However, defendant argues, such an argument would be misplaced.  According to defendant, in *Jones*, the Court held that its decision in *Goodman v. Lukens Steel Co.,* 482 U.S. 656 (1987), had been modified by statute.  124 S.Ct. at 1845.  In *Goodman*, the Court had held that federal courts should apply "the most appropriate or analogous state statute of limitations" to claims based on asserted violations of § 1981.  124 S.Ct. at 1839.  Defendant notes that for § 1981 actions arising in Alabama, the State's two-year statute of limitations for tort actions is used.  However, in 1990, Congress enacted 28 U.S.C. § 1658, which created a default four-year statute of limitations for laws passed after December 1, 1990.  124 S.Ct. at 1839.  The *Jones* court held that § 1658 changed the limitations period for some claims under § 1981 to four years.  *Id.* at 1845.  Specifically, the Court stated that to the extent that post-1990 enactments, such as the Civil Rights Act of 1991, created new causes of action not previously cognizable under § 1981, such claims were subject to the "catch-all" statute of limitations set forth in 28 U.S.C. § 1658.  *Id.*

Defendant argues that plaintiff's failure-to-promote claim under § 1981 would have been cognizable under *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), and, therefore, remains subject to the two-year statute of limitations mandated by *Goodman*.  Under *Patterson*, defendant notes, a failure-to-promote claim could be made under § 1981 if the promotion "rises to the level of an opportunity for a new and distinct relation between the employer and the employee."  491 U.S. at 185-86.  Defendant maintains that several cases that applied the *Patterson* standard for failure to promote claims under § 1981 held that a change from a non-supervisory position to a supervisory position or a non-exempt to an exempt position were the types of employment changes that created

17

a "new and distinct relation between the employer and the employee." *See Rodriguez v. General Motors Corp.*, 27 F.3d 396, 400 (9th Cir. 1994) (holding that the types of changes required by *Patterson* for a "new and distinct relation" would include changes "such as an increase in pay, the addition of supervisory duties, or a change in the chain of responsibility"); *Butts v. City of New York Dept. of Housing Preservation and Development,* 990 F.2d 1397, 1412 (2nd Cir. 1993) (stating, "any promotion that creates a qualitatively different relation between the employer and employee, for example, a move from factory worker to foreman, foreman to foreman supervisor, or manager to officer, likely would create a new and distinct relation giving rise to a § 1981 action under *Patterson*"); *Sitgraves v. Allied-Signal, Inc.,* 953 F.2d 570, 574 (9th Cir. 1992) (stating, "[w]e conclude that the move from a non-supervisory position to a supervisory one is therefore an actionable basis for a section 1981 failure-to-promote claim under *Patterson's* 'new and distinct relation' test. Similarly we conclude that the move from compensation based on hours worked to compensation based on an annual salary constitutes a sufficiently new and different contractual relationship to provide an actionable promotion claim").

Defendant points to the Memorandum Opinion issued on Monday, January 31, 2005 in *Jerry Summerlin v. M&H Valve Company*, Civil Action Number 04-AR-2786-M.  Defendant notes that in that case Summerlin sued M&H Valve for race discrimination under § 1981 because he was not awarded the very same CNC Supervisor position awarded to Yeager and sought by Price in this case. In *Summerlin*, defendant asserts, the court analyzed the Supreme Court's recent decision in *Donnelley* and determined that Summerlin's claims related to the promotion were subject to a two-year statute of limitations because there were "cognizable under § 1981 as it existed prior to the 1991 amendments."  Specifically, the court held that Summerlin's attempt to be promoted from an hourly

18

bargaining unit position to a supervisor position rose "to the level of an opportunity for a new and distinct relation between the employer and employee" and, therefore, was "not dependent on the 1991 expansion of § 1981."

 2. **M&H Valve is Otherwise Entitled to Summary Judgment on Plaintiff's Failure-to-Promote Claim.**

Defendant contends that it would be entitled to summary judgment on plaintiff's failure to promote claim regarding the position filled by Yeager even if it were timely.

According to defendant, to prevail on his discriminatory failure to promote claim, plaintiff must establish a prima face case by showing the following: (1) he is a member of a protected minority; (2) he was qualified and applied for the promotion; (3) he was rejected despite his qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted. *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000). Defendant asserts that, once a plaintiff has established this prima facie case of discrimination, the defendant must articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Id.* If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reason for promoting another instead of plaintiff were pretextual. *Id.*

Defendant notes that a "subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Chapman v. AI Transport,* 229 F.3d 1012, 1034 (11th Cir. 2000). "In a failure to promote case, however, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the officer who received the position he coveted." *Alexander*, 207 F.3d at 1339. "Rather, [a plaintiff] must adduce evidence that the disparity in

qualifications is 'so apparent as virtually to jump off the page and slap you in the face.'" *Cofield v. Goldkist, Inc.,* 267 F.3d 1264, 1268 (11th Cir. 2001) (citations omitted).  Defendant observes that for the discrepancies to "jump off the page and slap you in the face," they must be of such weight and significance that no reasonable person could have chosen the other candidate over the plaintiff. *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000).  Therefore, defendant asserts, the relevant inquiry "is not to judge which employee was more qualified, but to determine whether any disparity . . . is so great that a reasonable fact-finder could infer that [the defendant] did not believe [the person given the position]  to be better qualified." *Cofield,* 267 F.3d at 1268.

Moreover, defendant contends, "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [race]." *Lee*, 226 F.3d at 1253.  According to defendant, recent Eleventh Circuit decisions reinforcing these stringent standards have consistently emphasized that a court's role is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments.  *Lee*, 226 F.3d at 1254; *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000); *Damon v. Fleming Supermarkets Of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision"); *Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991).  According to defendant, the critical issue before this court is not "whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive." *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001).

        a.        **Plaintiff Cannot Establish a Prima Facie Case Regarding his**

**Failure-to-Promote Claim.**

Defendant maintains that plaintiff cannot establish the fourth element of his prima facie case – that an equally or less qualified person was hired into the position he sought. According to defendant, plaintiff cannot claim he was as qualified as Yeager for the CNC Supervisor position.

Defendant points out that, prior to being hired by M&H Valve as a CNC Operator in 2000, Yeager had approximately 10 years of experience in setting up and operating various types of CNC machines. Further, defendant observes, at Haney Company, Yeager's prior employer, he served as a leadman for one year and as a supervisor for approximately three years. As a leadman at Haney, Yeager supervised several employees while overseeing quality control and operating his own machine. Additionally, defendant notes, as a supervisor Yeager was responsible for supervising approximately 10 CNC Operators. While at Haney, Yeager learned how to set up and operate the 4-5 CNC machines at the company. Similarly, defendant argues, Yeager knew how to set up each of the 5 CNC machines at Champion Pneumatic and LaSalle Machine, the two places he worked prior to his time at Haney.

In contrast to Yeager, defendant contends, plaintiff had not even worked in M&H Valve's Machine Shop, where the CNC machines were located, for approximately two decades. According to defendant, there is no evidence that plaintiff ever operated, much less set up, a CNC machine prior to Yeager's promotion. Moreover, defendant asserts, unlike Yeager who had approximately 4 years of supervisory experience over CNC operators, plaintiff had never held a supervisory position.

**b.      Plaintiff Cannot Establish Pretext.**

Defendant argues that it is entitled to summary judgment even if plaintiff could establish a prima facie case because plaintiff cannot show that its legitimate, non-discriminatory reasons for

awarding the position to Yeager are pretextual.

Defendant notes that, once a defendant articulates a legitimate, non-discriminatory reason for its actions, "the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1801 (11th Cir. 1990). Defendant maintains that a plaintiff always bears the "ultimate burden of persuasion" that his or her race was the reason for the challenged employment decision. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 503 (1993). When faced with a motion for summary judgment, defendant contends, a plaintiff "cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a prima facie case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact." *Palmer v. Dist. Bd. of Trustees of St. Petersburg Junior College,* 748 F.2d 595, 599 (11th Cir. 1984).

Defendant asserts that it awarded the CNC Supervisory position to Yeager because of his 10 years of experience operating CNC machines and his four years of experience as a supervisor. According to defendant, plaintiff cannot show that these reasons are mere pretext. Moreover, defendant argues, plaintiff cannot provide any plausible scenario under which he should have even been considered for the position, which was over a part of the foundry where plaintiff had not worked for two decades.

**B.      Plaintiff's Retaliation Claim Regarding Defendant's Failure to Discipline Wayne Gill.**

It is defendant's position that plaintiff cannot establish a prima facie case of retaliation because he cannot show that M&H Valve's failure to discipline Wayne Gill constituted an adverse

employment action against him.

Defendant notes that employees are protected from retaliation for making a charge, testifying or participating in any investigation, proceeding or hearing under Title VII.  *See* 42 U.S.C. §2000e-3(a); 29 U.S.C. § 623(d).  Because plaintiff has not and cannot present direct or statistical evidence of retaliation, defendant argues, the standards of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) apply.  Defendant asserts, "[i]n order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) [he] participated in an activity protected by Title VII; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision."  *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).[16]

Even if Gill had made the most egregious racist statement ever uttered, defendant argues, plaintiff cannot maintain a retaliation claim under § 1981 based on the fact that Gill was not disciplined.  Defendant notes "[t]o be considered an adverse employment action for purposes of Title VII's anti-retaliation provision, the action must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'  Ultimate employment decisions include decisions such as termination, failure to hire, or demotion."  *Stavropoulos v. Firestone,* 361 F.3d 610, 616-17 (11th Cir. 2004) (citations omitted).  In this case, defendant contends, plaintiff had no employment action taken against him.  Instead, defendant asserts, plaintiff alleges that the failure of M&H Valve to take an adverse employment action against another employee somehow equates to

---

[16] Defendant further argues that the fact that the adverse employment action was taken after the protected activity, standing alone, is generally insufficient to prove a causal connection to satisfy a prima facie case. *Booth v. Birmingham News Co.,* 704 F.Supp. 213, 214 (N.D. Ala. 1988) *aff'd* 864 F.2d 793 (11th Cir. 1988).

retaliation against him.  Defendant asserts that its counsel could not find a single case in which a plaintiff asserted a retaliation claim based on an adverse action taken or not taken against another employee.  According to defendant, both common sense and legal precedent do not allow such claims.

Defendant argues further that, even if plaintiff could somehow demonstrate that M&H Valve's failure to punish Gill was an adverse employment action against himself, plaintiff has not and cannot present evidence showing that his E.E.O.C. charge and M&H Valve's decision were causally related.  Defendant argues that the evidence shows that the company did not discipline Gill because he denied making the statement and because there was no corroboration of Caruso's version of the conversation.  Defendant concludes that plaintiff cannot demonstrate that the company's treatment of Gill was motivated by any action of plaintiff, protected or not.

### C.   Plaintiff's Disparate Treatment Claim Regarding the Entrance Exam to M&H Valve's Supervisory Training Program.

Defendant next addresses plaintiff's claim that the TABE, used as en entrance exam to M&H Valve's supervisory training program, has a disparate impact on African-American employees. Defendant asserts that this claim was not part of plaintiff's Complaint, and notes that the supervisor training program was created through M&H Valve's cooperation with the E.E.O.C. in an attempt to eliminate any perception of discrimination with regard to the company's promotion decisions. Further, defendant argues, there is no evidence that plaintiff's failure to enter the program has cost him a single promotional opportunity.  Finally, defendant maintains, plaintiff has not even attempted to make the necessary statistical showing that M&H Valve's use of the TABE has had an adverse impact on African-American employees.

24

Defendant points out that, "to state a prima facie case of disparate impact discrimination, a plaintiff must establish that (1) there is a significant statistical disparity among members of different racial groups; (2) there is a specific, facially-neutral employment policy or practice; and (3) there is a causal nexus between the specific policy or practice and the statistical disparity."  *Cooper v. Southern Co.*, 390 F.3d 695, 724 (11th Cir. 2004).  Defendant highlights the following passage from *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000):

> "... [T]o surmount the first hurdle in a disparate impact race discrimination case, the plaintiff must make out a prima facie case 'that [a] facially neutral employment practice ha[s] a significantly discriminatory impact.' " [*In re Employment Discrimination Litigation Against State of Ala.*, 198 F.3d 1305, 1311 (11th Cir. 1999)] (quoting *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982)). As the Supreme Court explained in *Watson*, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that *the practice in question* has *caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson* [v. *Fort Worth Bank and Trust*], 487 U.S. [977,] 994, 108 S.Ct. 2777 [(1988)] (emphasis added); *see also Edwards v. Wallace Community College*, 49 F.3d 1517, 1520 (11th Cir.1995) (observing that "[a] plaintiff must identify a specific employment practice that leads to the disparate impact"); *MacPherson* [v. *University of Montevallo*], 922 F.2d [766,] 771 (noting that " 'a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack' ") (internal citation omitted).

Moreover, defendant contends, "in order to satisfy the third, critical requirement, a plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Cooper v. Southern Co.,* 390 F.3d 695, 724 (11th Cir. 2004) (citation and internal punctuation omitted).  Defendant asserts that if a plaintiff can make out a prima facie case, then the burden shifts to the defendant to establish that the practice serves a legitimate, non-discriminatory business objective.  *Joe's Stone Crab, Inc.*, 220 F.3d at 1275.  Finally, defendant states, if the

defendant meets its burden in the second state, the plaintiff must prove that an alternative, non-discriminatory practice would have served the defendant's stated objective equally well. *Id.*

According to defendant, plaintiff cannot establish a prima facie case of disparate impact discrimination as he has not and cannot provide any evidence that the use of the TABE and/or the 10th grade level testing requirement caused a "statistically significant disparity" between white and black applicants for the supervisor training program initiated by M&H Valve. Defendant contends that plaintiff has not named an expert in this matter and has not done any discovery that would show the testing methodology used for the program causes black employees to be treated differently.

Even if plaintiff could somehow show a statistically significant disparity in how black and white employees performed on the screening test, defendant argues, M&H Valve has provided a legitimate, non-discriminatory business objective served by the testing requirements. Specifically, defendant asserts, M&H Valve instituted the 10th grade level testing requirement on the TABE because of the need for its supervisors to be able to: do mathematical calculations; read, understand and follow instructions; and clearly and concisely communicate with superiors and those he or she is supervising. Defendant argues that plaintiff cannot provide an alternative means for meeting these objectives.

## II.     Plaintiff's Response.

### A.     Plaintiff's Failure to Promote Claims.

Plaintiff asserts, "[t]o establish a prima facie case of discriminatory failure to promote, a plaintiff must prove: (1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted." *Combs v. Plantation*

26

*Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997).  As an African-American, plaintiff argues, he is a member of a protected class.  According to plaintiff, he was qualified for the supervisory positions at M&H Valve as he had worked all over the plant, trained other employees, been a Journeyman Coremaker, and held a position of leadership in the union.  Price asserts he did not apply for the open supervisory positions because M&H Valve had no application procedure and no notice was provided to current employees when a supervisory position was available.  However, plaintiff asserts that he expressed an interest in supervisory positions at M&H Valve, and that none of the M&H Valve supervisors who were promoted from within or hired from the outside had as much experience with the company as he did.

Plaintiff argues that "where an employer has an informal promotion procedure, such as where job openings are not posted or the employer does not require employees to submit applications in order to be considered for a promotion, an employee may establish [that he applied for the disputed position] simply by showing that the position was available and that the employer had some reason or duty to consider him for the post."  *Miller v. Bed, Bath and Beyond, Inc.*, 185 F.Supp.2d 1253, 1267 n.13 (N.D. Ala. 2002) (citing *Jones v. Firestone Tire and Rubber Co., Inc.*, 977 F.2d 527, 533 (11th Cir.1992); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133-34 (11th Cir.1984)).  Plaintiff maintains that defendant had a duty to consider him for supervisory positions, because, at the time plaintiff made his Charge of Discrimination with the E.E.O.C., defendant had no African-American supervisors in its ranks.  Further, plaintiff asserts that he had trained many employees at M&H Valve and that he, as a long-term employee, knew the plant as well as anyone.

Additionally, plaintiff contends, "when the failure to promote arises out of an informal, secretive selection process, . . . a plaintiff may raise an inference of intentional, racially-disparate

27

treatment without proving that he technically applied for, and failed to obtain, the promotion." *Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793, 797 (11th Cir. 1984) (citing *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir.1984)). To support his position, plaintiff quotes the following excerpt from *Roberts*:

> In *Carmichael*, an employer awarded a promotion to a white employee with less seniority than a black employee of good standing. The promotion process was completely informal and provided no checks against racial bias. The only means by which an employee received notice of a promotion opportunity was by word of mouth. 738 F.2d at 1132-33. The record demonstrated that it was during lunchbreak that word of mouth circulated. Lunchbreak, however, was a time when most of the black employees' coworkers, who were white, socialized together with the foreman. The record showed that the plaintiff was made to feel unwelcome at these lunch gatherings. Id. at 1133 n. 2.

*Roberts*, 835 F.2d at 798.

Plaintiff also cites *Hill v. Seaboard Coast Line Railroad Co.,* which involved the discriminatory treatment of carmen/foremen in an employment situation where the selection process for promotion was informal. 767 F.2d 771, 773 (11th Cir. 1985). The employees were never given notice that vacancies existed and only the all-white supervisory decisionmakers knew the subjective promotion criteria. *Id.* The *Hill* court found that it was "difficult to imagine how a large corporation with a numerous work force can expect to satisfy its legal duties towards minorities when its selections for promotion are made in such an unstructured and unguided manner. Of course, subjective criteria are not discriminatory per se, but a corporation which uses subjective criteria cannot hide behind those criteria to protect itself from a finding of discrimination." *Id*. at 775.

According to plaintiff, subjective requirements, "such as the possession of 'initiative and judgment capabilities' and the ability 'to relate to people in a manner to win confidence and establish support' are incapable of objective evaluation. They cannot be relied upon by an employer seeking

to defeat the plaintiff's prima facie case by showing that the plaintiff is less qualified than the applicant chosen for the promotion." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998). Additionally, plaintiff points out that the Eleventh Circuit has held that courts should view subjective criteria with greater scrutiny as compared to an employer's written criteria utilized in making an employment decision. *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994).

Further, plaintiff contends that "subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination." *Miles v. M.N.C. Corp.,* 750 F.2d 867, 871 (11th Cir. 1985). "This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another. In addition, subjective and vague criteria may be insufficient reasons given by an employer for its failure to rehire because such criteria do not allow a reasonable opportunity for rebuttal." *Id.*

Plaintiff moreover cites *Flower v. Blue Bell, Inc*. for the proposition that "the nature of the defendant's selection process and of the reasons that he offers affects the weight of his burden. Where the reasons that the employer offers for rejection are based on purely subjective factors, the defendant's burden is greater." 737 F.2d 1007, 1010-11 (11th Cir. 1984).

If the defendant does not utilize a formal posting system for open, available jobs, plaintiff argues, it has a duty to consider all of those who might have been interested in the job. *Lane v. Ogden Entertainment, Inc.*, 13 F.Supp.2d 1261, 1275 (M.D. Ala. 1998). "[P]retext may be shown because the qualifications for [the sought position were] never written, but instead were created by" the decision maker. *Id.* at 1276. "This factor alone is enough to give the Defendant some problem on summary judgment. The Eleventh Circuit has held that 'the failure to promulgate hiring and

promotion policies can be circumstantial evidence of discrimination.'" *Id.* at 1276-77 (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998)).

Plaintiff states that "pretext is also presented where the qualifications for the job are the result of subjective analysis." *Lane*, 13 F.Supp.2d at 1277.   "Where subjectivity on the part of differently-raced supervisors is the basis of job requirements, the Eleventh Circuit has recognized that there is a 'ready mechanism for racial discrimination.'" *Id.*  (citing *Carter*, 132 F.3d at 644).

If the employer does not consider a plaintiff's qualifications at the time the decision is made, plaintiff contends, the employment decision cannot be defended on the basis of relative qualifications. *Joshi v. Florida State Univ. Health Center*, 763 F.2d 1227, 1235 (11th Cir. 1985). According to plaintiff, M&H Valve never considered him for any promotional opportunities or advancement at the company and, therefore, his qualifications were never considered when it made those decisions.

Plaintiff asserts that circumstantial evidence that is relevant to the issue of pretext can be in the form of failing to post vacancies.   "We have held that the failure to promulgate hiring and promotion policies can be circumstantial evidence of discrimination."  *Carter,* 132 F.3d at 644 (citing *Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377, 1382-83 (11th Cir.1983)).

Plaintiff argues that like the plaintiffs in *Roberts* and *Carmichael*, he never knew of a promotional opportunities as they were never announced.  According to plaintiff, he learned of the positions only after the decisions had been made.  "Failing to consider Roberts in itself constituted disparate treatment under [the facts of that case]." *Roberts*, 835 F.2d at 798.  Plaintiff maintains that, similarly in the instant case, M&H Valve's failure to consider him for the supervisor positions is disparate treatment.  "Where . . . an employer has reason to know that an employee is qualified for

30

a position and that the employee might desire to be considered for that position, the employer's failure to consider the employee for promotion is not a legitimate, nondiscriminatory reason sufficient to rebut an inference of intentional disparate treatment successfully raised under the *McDonnell Douglas* test." *Id.* at 798.

In regard to his claims concerning the position filled by Nance, plaintiff points to Baldwin's testimony that he believed Nance was hired in 2000 or 2001 but that he wasn't sure of the exact year. According to plaintiff, this testimony makes it impossible to determine if his claims regarding this position are timely.[17]   Plaintiff makes no specific arguments concerning his claims involving the position awarded to Yeager.

### B.      Plaintiff's Retaliation Claims.

Plaintiff argues that "with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case; the plaintiff must show (1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities." *Coutu v. Martin County Bd. Of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). "This circuit has interpreted the causal link requirement broadly; 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Id.* (quoting *E.E.O.C. v. Reichold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).  Plaintiff claims that, after his Charge of Discrimination, he and other African-Americans were singled out and questioned by lawyers representing defendant.  According to plaintiff, defendant's Caucasian employees were not

---

[17] However, the court notes that Nance testified that he was hired on August 23, 1999. (Nance Depo., p. 28).

subjected to such treatment.  Additionally, plaintiff argues that after his Charge, he was denied promotional opportunities that were given to employees with less experience than himself.  Finally, plaintiff asserts he has demonstrated his leadership abilities by union office and has had a spotless performance and disciplinary record at M&H Valve.

In his final Response, plaintiff appears to abandon his claim that M&H Valve retaliated against him by not punishing Gill for his alleged racially-based comment.  Plaintiff states, "[t]he fact that Gill wasn't disciplined is not retaliatory to Mr. Price, but his statement is evidence of retaliation and the fact that M&H Valve did nothing about it is evidence of retaliation."

Plaintiff makes the following arguments regarding his claim that defendant retaliated against him by promoting less-experienced African-Americans instead of him.  Plaintiff contends that this retaliation occurred after he refused to accept a conciliation offer.  According to plaintiff, he expressed an interest in being promoted but his supervisor did not consider him.  Plaintiff quotes the E.E.O.C. finding as follows: "[T]here is reasonable cause to believe that a class of blacks have been subjected to retaliation by singling them out and subjecting them to intimidation as a direct result of Respondent's receipt of the Commission's earlier determination citing Respondent for racial harassment."[18]  Further, plaintiff maintains, the African-Americans who did receive supervisory positions were told not to tell anybody about them.

C.    Plaintiff's Racial Slur Claim.

Plaintiff maintains that actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination and retaliation complained of by an employee

_____

[18] The court notes that this conclusory statement makes no reference to particular parties or positions.

constitutes direct evidence of discrimination.  *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990).[19]  Plaintiff notes that, in *E.E.O.C. v. Alton Packaging Corp,* it was held that a production manager's statement to a black employee that "'you people can't do a ____ thing right" constituted direct evidence of discrimination.  901 F.2d 920, 923 (11th Cir. 1990).  Plaintiff also points out that in *E.E.O.C. v. Beverage Canners, Inc.,* racial slurs were found to be direct evidence of discrimination.  897 F.2d 1067, 1072 (11th Cir. 1990).  Additionally plaintiff asserts that in *Miles v. M.N.C. Corp.*, a statement by a plant manager that he wouldn't hire blacks because "half of them weren't worth a shit" was direct evidence of discrimination.  750 F.2d 867, 874-76 (11th Cir. 1985).[20]

### D.   Plaintiff's Disparate Impact and Failure to Train Claims.

#### 1.   Plaintiff's Disparate Impact Claim Regarding the Entrance Exam to Defendant's Supervisory Training Program.

Plaintiff alleges that M&H Valve's new training procedure, which contains no African-American applicants, has not been determined to be reasonably related to the supervisor's position.  Plaintiff maintains that defendant has conducted no study or research to determine whether the curriculum correlates to the job or any necessary qualifications of a supervisor.  Plaintiff highlights Baldwin's following testimony concerning the entrance exam to defendant's supervisory training

---

[19] *Caban-Wheeler* stated that a plaintiff satisfied his or her burden of showing discrimination simply by showing that defendant's proffered reasons for the allegedly discriminatory act are unworthy of credence.  904 F.2d at 1554.  The Supreme Court's ruling in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), abrogated this ruling by requiring that the plaintiff show not just that defendant's explanation was false but also that discrimination was the real reason for the action.  509 U.S. at 513-15.  However, the portion of *Caban-Wheeler* relied on by plaintiff here appears unaffected by *Hicks.*

[20] Any such direct evidence statements must be attributed to a decision maker or decisions making contributor.

program:

> Q:   Sure.  Did M&H or any of the other folks, the consultants, the school,
> undertake any kind of studies or review any kind of research to, let's say, start
> with the testing criteria to determine if the testing criteria had a reasonable
> relationship to the job that was to be filled, the supervisor job to be filled?
> A:   I don't know.  I don't know of any studies or research that was done into that.
> Q:   What about with regards to the development of the curriculum?  Was there
> any research that was reviewed or studies done to determine whether or not
> the curriculum had a reasonable relationship to the supervisory position?
> A:   I don't know of any studies or research that was done in that, other than
> basically the consultant and us talking with the schools to determine that does
> the time management course have application to a supervisor?  And it seemed
> fairly easy to make the leap that it did.

(Baldwin Depo., p. 50).

**2.      Plaintiff's Failure to Train Claim.**

In support of his failure to train claim, plaintiff argues that defendant's current supervisory

training program discriminates because none of the existing supervisors had to attend the program

or meet the testing requirements for entrance into the program.  Plaintiff cites to *Alexander v. Vesta*

*Ins. Group, Inc.,* in which five white underwriting assistants were given training and advantageous

transfers to underwriters' positions, while Alexander and the other plaintiffs, who also worked in

commercial lines and held the same job titles with greater experience than the whites, were denied

such opportunities.  147 F.Supp. 2d 1223, 1235 (N.D. Ala. 2001).  The *Alexander* court concluded

that such evidence, if unrebutted, was enough to permit an inference of discrimination.  *Id.*  Plaintiff

asserts that he trained white employees who went on to hold supervisory positions.  He also claims

that he did not receive the same extensive training that his white co-employees received before

advancing.

**III.     Defendant's Reply.**

34

### A.   Plaintiff's Failure to Promote Claims.

Defendant asserts that it is entitled to summary judgment with regard to the promotion claims relating to Chuck Yeager and Dean Nance.  First, defendant notes that, in his final Response, plaintiff failed to argue his claim regarding the position awarded to Yeager.  According to defendant, plaintiff has apparently abandoned this claim.

Regarding the position awarded to Nance, defendant argues that Nance was hired on August 23, 1999,[21] more than four years before plaintiff filed this action in October 2003.  Accordingly, defendant asserts, any claim by plaintiff relating to the hiring of Nance would clearly be time barred under Section 1981 and Title VII.  Moreover, defendant maintains, even if this claim was not time-barred, plaintiff does not even begin to argue that he was as qualified or better qualified than Nance, who had several years of supervisory experience prior to being hired for the supervisory position at issue.[22]

### B.   Plaintiff's Retaliation Claims.

"In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1)[he] participated in an activity protected by Title VII; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision."  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).  Timing alone, defendant argues, is insufficient to prove the causal

---

[21] According to defendant, after his deposition, Baldwin reviewed his records and determined that Nance was hired on August 23, 1999.  Defendant directs the court's attention to Exhibit B of the August 26, 2004 letter of its counsel to the court.

[22] Defendant asks that, in light of plaintiff's "unjust attempt to again change his promotion claim,"the court require that plaintiff pay defendants costs, including attorneys' fees, associated with its Supplemental Motion for Summary Judgment.

connection.  *See Booth v. Birmingham News Co.*, 704 F. Supp. 213 (N.D. Ala. 1988).

M&H Valve deems meritless Price's claim that defendant promoted three other African-American employees – Summerlin, Chatman, and Calloway – in retaliation against Price for filing his E.E.O.C. charge.  According to Price's deposition, he believes he should have been awarded these positions because of greater seniority at the plant, his experience working in several areas of the plant, and his previous work training employees.  (*See* Price Depo., pp. 83, 109-12).

The most "glaring hole" in Price's argument, M&H Valve contends, is the fact that Summerlin, Chatman, and Calloway had each filed a formal grievance in January 1999 for alleged discrimination in regard to promotions.  In fact, defendant reiterates, Summerlin was the union representative responsible for rallying co-workers, including plaintiff, Chatman, and Calloway.  Moreover, M&H Valve contends, Summerlin hired the same attorney as plaintiff and filed a lawsuit asserting claims very similar to plaintiff's.  According to M&H Valve, "[i]f M&H Valve possessed a retaliatory animus against any of these employees for their complaints regarding discrimination, which it clearly did not, it would have directed such animus against Summerlin, the 'ring leader' of the grieving employees."

M&H Valve again describes the reasons it promoted Summerlin, Chatman, and Calloway. *See supra*.  In fact, defendant points out, plaintiff agreed in his deposition that each of these men were qualified to be supervisors, he was proud of them for achieving this rank, and he was "glad" these men were promoted.  (*See* Price Depo., pp. 162-63, 182, 109).  M&H Valve concludes: "In the absence of any evidence of retaliatory animus on the part of M&H Valve, Plaintiff's subjective belief that he was more qualified to fill the supervisor positions awarded to Summerlin, Calloway, and Chatman is insufficient as a matter of law to show .... pretext for discrimination."

Defendant also disputes plaintiff's claims that he was questioned by M&H Valve's attorney concerning discrimination at the company.  According to defendant, plaintiff was not interviewed by M&H Valve's lawyers.  Defendant maintains that the interviews at issue were with employees who had not filed E.E.O.C. charges of discrimination.  Moreover, defendant contends, even if plaintiff had been interviewed by M&H Valve's lawyers, plaintiff has not and cannot establish that this interview: (1) took place at M&H Valve's behest; or (2) that participating in such an interview constituted an adverse employment action for purposes of Title VII or §1981.

### C.     Plaintiff's Disparate Impact/Failure to Train Claim.

According to defendant, plaintiff's failure to train claim fails as a matter of law.  Defendant argues that, other than the supervisory training program, plaintiff has failed to identify a single training opportunity that has been offered to white employees but not to him.  Defendant contends that this failure to specify which training has been discriminatorily withheld from him completely defeats this claim.

Defendant argues that plaintiff has apparently abandoned his disparate impact claim regarding M&H Valve's supervisory training program.  Defendant points to plaintiff's argument that none of the current supervisors at M&H Valve had to participate in the training program.  Defendant contends that this argument ignores the fact that several of these current supervisors are African-American.[23]

### D.     Plaintiff's Racial Slurs Claim.

Defendant next addresses plaintiff's "racial slur" claim.  According to defendant there is no

---

[23] Defendant argues that plaintiff's failure to train claim is "beyond frivolous," and asks that the court order plaintiff to pay its cost and attorneys' fees related to defending this claim.

independent cause of action under Title VII or § 1981 for "racial slurs."  Defendant asserts that plaintiff's allegations under this claim clearly fail to give rise to any violation of these statutes.

First defendant discusses plaintiff's claims that Gill uttered a racial slur during his conversation with Caruso.  Defendant draws the court's attention to Caruso's written statement, and argues that there is no mention of any racial slur or epithet uttered by Gill.  Second, regarding plaintiff's claims that a co-worker called him "Sambo," defendant notes that plaintiff himself testified that these statements took place in the 1980s.[24]

## CONCLUSIONS OF THE COURT

At the January 18, 2005 hearing in this matter, Price's counsel limited his client's claims in this action to the following: (1) M&H Valve discriminated against Price by failing to promote him to the position of CNC Supervisor and instead awarding the position to Chuck Yeager in October 2000;[25] (2) M&H Valve's entrance exam for its supervisory training program, which Price failed, has a disparate impact on black employees;[26] and (3) M&H Valve retaliated against Price when it failed to discipline Wayne Gill after he allegedly made "racial slurs."[27]

---

[24] Defendant ask that the court order plaintiff to pay its costs and attorneys' fees associated with responding to his final Response.

[25] The decision makers regarding the promotion of Yeager were: (1) Baldwin; (2) Fulmer; (3) Plant Manager Richard Duncan or Plant Manager Alvin Samples; (4) Vice President and General Manager David Green or Vice President and General Manager Thomas Walton; and (5) Assistant Department Manager Cecil Payne.  (Baldwin Depo., pp. 20-21).

[26] M&H Valve instituted the supervisory training program in July 2003 as part of a conciliation agreement with the E.E.O.C.  Price took the TABE, the entrance exam for the program, twice.  Each time he failed to test at a tenth-grade level, as required for entrance into the program.

[27] This retaliation claim, as well as the other two discussed below, allegedly arises from Price: (1) joining with other third shift core room employees in filing a union grievance on June

In his final Response, Price's counsel asserted the following additional claims: (4) M&H Valve discriminated against Price by failing to promote him to the position of Machine Shop supervisor awarded to Dean Nance in 2000-2001;[28] (5) M&H Valve failed to offer Price training opportunities that were made available to other, similarly-situated non-African-American employees;[29] (6) M&H Valve retaliated against Price by promoting less experienced African-Americans instead of him;[30] (7) M&H Valve retaliated against Price in that he and other African-American, but not Caucasian, employees were questioned by M&H Valve's attorney regarding their beliefs that M&H Valve participated in racial discrimination;[31] and (8) M&H Valve subjected Price to discrimination by failing to remedy the use of racial slurs against him by other

---

11, 2001 concerning M&H Valve's change in the incentive pay of those employees; (2) joining with co-worker James Hubbard in a grievance filed in June 2001 concerning Gill's alleged statement; (3)  filing the E.E.O.C. Charge of Discrimination on May 1, 2001; and/or (4) failing to accept a conciliation offer made by the company.  Price has not identified which conciliation offer he refused.  Gill allegedly made the race-based comment in June 2001.

[28] Although Baldwin testified that he believed Nance was hired as a Machine Shop supervisor in 2000 or 2001, (Baldwin Depo., pp. 19-20), Nance testified that he was hired on August 23, 1999, (Nance Depo., p. 28).  The decision makers regarding the hiring of Nance were: (1) Baldwin; (2) Fulmer; (3) Plant Manager Richard Duncan or Plant Manager Alvin Samples; and (4) Vice President and General Manager David Green or Vice President and General Manager Thomas Walton.  (Baldwin Depo., pp. 20-21).

[29] Other than M&H Valve's supervisory training program, Price has not identified any particular training opportunity which was offered to other employees but not to him.

[30] This claim appears to concern the following promotions: (1) the promotion of Jerry Summerlin to Assembly Supervisor in the Machine Shop on June 10, 2002; and (2) the promotions of Grady Calloway and Rodney Chatman to Foundry Supervisor positions on July 1, 2002.

[31] Price does not identify which of M&H Valve's attorneys did this questioning or which employees were so questioned.  Further, although Price states that this questioning occurred after he filed his E.E.O.C. charge, he does not give a more specific time frame.

employees.[32]

The court addresses plaintiff's claims *seriatim.*

(1) The court assumes, without deciding, that plaintiff has proved a prima facie case as to the CNC Supervisor position awarded to Yeager.[33]  The defendant has articulated that it hired Yeager because he was much better qualified for the job than other possible applicants.  The court will not repeat the unrebutted articulations recited above.  The court has considered the cases of *Lee v. GTE Florida, Inc.,* 226 F.3d 1249 (11th Cir. 2000), and *Cofield v. Goldkist, Inc.,* 267 F.3d 1264 (11th Cir. 2001), which have application here.  There is no substantial evidence that defendant's decision was motivated by race.  *See Lee*, 226 F.3d at 1253.  Plaintiff was certainly not so well qualified for the position that the disparity "jump[s] off the page and slap[s] you in the face."  *Cofield*, 267 F.3d at 1268 (citations omitted); *Lee*, 226 F.3d at 1254.  Seniority is not a controlling factor.  *Cofield*, 267 F.3d at 1269.

While the decision to name Yeager was based on objective factors, even subjective decisions are not per se discriminatory.  *See Cofield*, 267 F.3d at 1268 n.7; *Chapman v. AI Transport,* 229 F.3d 1012, 1033 (11th Cir. 2000).  The Motion is due to be granted as to this claim.

(3) As to the Wayne Gill "racial slur" "retaliation" claim, there has been no proof that any adverse action was taken against plaintiff.  Plaintiff has not alleged nor offered proof of the essential elements of a hostile environment claim.  The Motion will be granted as to this claim.

---

[32] This claim is based upon Gill's alleged June 2001 comment and Price's assertions that a co-worker named Steelwell called him "Sambo" in the 1980s.

[33] It is very doubtful that plaintiff has offered substantial proof that he was minimally qualified for the job.

(6) The court next addresses plaintiff's promotion of other African-Americans "retaliation" claim.  The African-Americans who were promoted had engaged in the same conduct as had the plaintiff.  At least one of them likely took more of a lead in that conduct than did the plaintiff.  There is no reasonable inference of causation.  The Motion will be granted as to this claim.

(7) As to the questioning by attorneys retaliation claim, there is no evidence of an adverse action.  The Motion will be granted as to this claim.

(8) Plaintiff's racial slur claim is barred by the statute of limitations.  In any event, it is not framed as a hostile environment claim by allegation or proof.  The Motion will be granted as to this claim.

(2) and (5) As to the discriminatory impact and training claims, the court orders as follows:

Within ten days the parties will further address these claims, including, but not restricted to, addressing the law and facts in the record as to: (a) Who has the burden to establish that the test does or does not have a discriminatory impact on African-Americans?  What must be proved?  How?  (b) What percentage of whites who have taken the test passed?  What percentage of African-Americans who have taken the test passed?  (c) Has the E.E.O.C. approved the test? (d) Does the same test apply to all supervisory positions?  Appropriately so?  (e) What evidence is there of training offered to whites and not African-Americans before the testing procedure was established?  Any data on relative numbers?  (f) Other?

(4) As to the Nance position, the court orders as follows.

Within ten days, the parties will further address this claim, including, but not restricted to,

41

addressing the following: Was discrimination regarding this position alleged in an E.E.O.C.

charge?  What evidence is there in the record as to the date of hire of Nance into the position?  If

there is no such evidence, the parties shall provide a copy of records maintained in the regular

course of business which establish the date.

      As to the latter three claims, the parties may offer argument, proof, and law not addressed

above by the court.

      This 9th of March, 2005.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**