FILED

2005 Mar-30  AM 10:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **WILBERT PRICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV-03-PT-2785-M** |
| | ) | |
| **M&H VALVE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendant M&H Valve Company's ("M&H Valve")

Motion for Summary Judgment, filed on June 28, 2004, and  Supplemental Motion for Summary

Judgment, filed on February 4, 2005.

**FACTS AND PROCEDURAL HISTORY**

The court has already largely addressed these motions in its March 9, 2005 Memorandum

Opinion in this action.[1]  In that document, the court summarized the claims of Wilbert Price

("Price"), the plaintiff, as follows:

> (1) M&H Valve discriminated against Price by failing to promote him to the
> position of CNC Supervisor and instead awarding the position to Chuck Yeager in
> October 2000; (2) M&H Valve's entrance exam for its supervisory training
> program, which Price failed, has a disparate impact on black employees;[2] and (3)
> M&H Valve retaliated against Price when it failed to discipline Wayne Gill after

---

[1] Most of the facts and arguments relevant to the present motions were addressed in the
March 9, 2005 Memorandum Opinion.  Those facts and arguments have not been repeated here.

[2] M&H Valve instituted the supervisory training program in July 2003 as part of a
conciliation agreement with the E.E.O.C.  Price took the Test of Adult Basic Education
("TABE"), the entrance exam for the program, twice.  Each time he failed to test at a tenth-grade
level, as required for entrance into the program.

1

he allegedly made "racial slurs."

> . . . (4) M&H Valve discriminated against Price by failing to promote him to the position of Machine Shop supervisor awarded to Dean Nance in 2000-2001;[3] (5) M&H Valve failed to offer Price training opportunities that were made available to other, similarly-situated non-African-American employees;[4] (6) M&H Valve retaliated against Price by promoting less experienced African-Americans instead of him; (7) M&H Valve retaliated against Price in that he and other African-American, but not Caucasian, employees were questioned by M&H Valve's attorney regarding their beliefs that M&H Valve participated in racial discrimination; and (8) M&H Valve subjected Price to discrimination by failing to remedy the use of racial slurs against him by other employees.

(some footnotes omitted).  In accordance with the reasons given in the March 9, 2005 Memorandum Opinion, defendant's motions will be granted in regards to claims (1), (3), (6), (7) and (8) above.  In reference to the three remaining claims, the Memorandum Opinion indicated as follows:

> (2) and (5) As to the discriminatory impact and training claims, the court orders as follows:
>
> Within ten days the parties will further address these claims, including, but not restricted to, addressing the law and facts in the record as to: (a) Who has the burden to establish that the test does or does not have a discriminatory impact on African-Americans?  What must be proved?  How?  (b) What percentage of whites who have taken the test passed?  What percentage of African-Americans who have taken the test passed?  (c) Has the E.E.O.C. approved the test?  (d) Does the same test apply to all supervisory positions?  Appropriately so?  (e) What evidence is there of training offered to whites and not African-Americans before

---

[3] Although M&H Valve Personnel Manager Roger Baldwin ("Baldwin") testified that he believed Nance was hired as a Machine Shop supervisor in 2000 or 2001, (Baldwin Depo., pp. 19-20), Dean Nance ("Nance") testified that he was hired on August 23, 1999, (Nance Depo., p. 28).  The decision makers regarding the hiring of Nance were: (1) Baldwin; (2) Machine Shop Supervisor Mike Fulmer ("Fulmer"); (3) Plant Manager Richard Duncan or Plant Manager Alvin Samples; and (4) Vice President and General Manager David Green or Vice President and General Manager Thomas Walton.  (Baldwin Depo., pp. 20-21).

[4] Other than M&H Valve's supervisory training program, Price has not identified any particular training opportunity which was offered to other employees but not to him.

the testing procedure was established?  Any data on relative numbers?  (f) Other?

(4) As to the Nance position, the court orders as follows.

Within ten days, the parties will further address this claim, including, but not restricted to, addressing the following: Was discrimination regarding this position alleged in an E.E.O.C. charge?  What evidence is there in the record as to the date of hire of Nance into the position?  If there is no such evidence, the parties shall provide a copy of records maintained in the regular course of business which establish the date.

On March 23, 2005, the parties responded to the March 9, 2005 Memorandum Opinion.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of explaining the basis of his motion.  *Celotex*, 477 U.S. at 323.  "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial."  *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).  Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial.  *Comer*

3

*v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS[5]

### I.    Defendant's Response.

####       A.    Plaintiff's Claim Relating to the Hiring of Dean Nance.

#####             1.    Plaintiff's E.E.O.C. Charge Did Not Include a Claim Relating to Nance's Hiring as a Supervisor.

Defendant argues that plaintiff's E.E.O.C. charge,[6] which was filed on May 1, 2001, did

---

[5] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

[6] Price's E.E.O.C. charge alleged only race discrimination and stated as follows:

> On or about February 10, 2001, and on a continuing basis, the above-named employer has denied me the opportunity to apply for a position as a supervisor. I have been employed by the employer since November 1972, and my current position is core maker in the Foundry Department.

> Although I have objected to the employer's continuous failure to advertise vacant supervisory positions, I have been given no reason for the employer's failure to announce supervisory vacancies, or its failure to promote Blacks to supervisory positions. The employer's position is that no discrimination has occurred, but no explanation is given.

4

not contain any allegations relating to M&H Valve's decision to hire Nance as a supervisor in its

Machine Shop on August 23, 1999.  Instead, defendant points out, plaintiff alleged in his

E.E.O.C. charge that M&H Valve denied him an opportunity to apply for supervisor positions

beginning on or about February 10, 2001.  Defendant asserts that plaintiff later clarified in his

deposition that the February 2001 hiring he referenced in his E.E.O.C. charge was that of

William "Dud" Watson, a supervisor in the Electric Melt Department, not Nance.  (Price Depo.,

pp. 123-26).  According to defendant, plaintiff never mentioned Nance in his deposition.

Moreover, defendant contends, even if plaintiff had asserted a discrimination claim in his

E.E.O.C. charge relating to Nance's hiring, such a claim would relate to an employment decision

that took place approximately 537 days before he filed a charge, well outside of the 180-day

window for such claims under Title VII.  Clearly, defendant concludes, plaintiff's claims related

to the hiring of Nance were not part of his E.E.O.C. charge, and plaintiff cannot, for this reason

alone, assert such claims under Title VII.  *See Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n.8

(11th Cir. 1994) (stating, "[a] plaintiff's judicial complaint is limited by the scope of the E.E.O.C.

investigation which can reasonably be expected to grow out of the charge of discrimination").

--------

I believe I have been discriminated against because of my race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended.  White employees who have less seniority and experience are promoted over comparably qualified Black employees.

I believe the employer's practice of failing to announce vacancies for supervisory positions, and its practice of selecting White employees for supervisory positions, while failing to provide equal opportunity for Black employees to seek advancement discriminates against Blacks as a class with respect to promotion. Black employees are also subjected to racial harassment in the form of racial slurs, jokes, and differences in treatment.  The employer is aware of these actions and has taken no action to correct the racially derogatory slurs by its managers.

5

## 2.      Evidence Regarding the Date of Nance's Hire.

Defendant draws the court's attention to a document, entitled "Authorization to Hire Salaried Employee" and dated August 12 and 13, 1999.  The document indicates that Nance was hired to start work on August 23, 1999.[7]  Because this employment decision was made more than two (or four) years before plaintiff filed the present lawsuit on October 10, 2003, defendant concludes, his failure-to-promote claims arising from the hiring of Nance are clearly time-barred under both Title VII and Section 1981.[8]

## B.      Summary Judgment of Plaintiff's Disparate Impact/Failure to Train Claims.

Defendant maintains that plaintiff is precluded from asserting his disparage impact claim relating to M&H Valve's supervisory training program under either Title VII or Section 1981.

## 1.      Plaintiff's Disparate Impact Claim Under Title VII.

Defendant argues that plaintiff's disparate impact claim under Title VII is defective because he did not assert the claim in his May 1, 2001 E.E.O.C. charge.  Plaintiff's E.E.O.C. charge, defendant notes, did not contain any claim that M&H Valve failed to provide him with any type of training provided to white employees.  Furthermore, defendant contends, plaintiff could not have asserted such a claim in his charge because M&H Valve's supervisory training

---

[7] Defendant notes that plaintiff has asserted that Nance was hired in 2000 or 2001 based on Baldwin's estimate during his April 14, 2004 deposition in this case.  According to defendant, to the extent that plaintiff continues to argue that Nance was hired in 2000 or 2001, such a claim is clearly and conclusively defeated by the undisputed evidence that Nance was actually hired on August 23, 1999.

[8] In addition to this claim being time barred, defendant contends it is also entitled to summary judgment on this claim for substantive reasons.  Specifically, defendant asserts, plaintiff has failed to present any evidence that he was as qualified or more qualified for the supervisory position than Nance, who, according to defendant, had worked as a supervisor at Goodyear for many years before being hired by M&H Valve.

6

program was initiated in 2003, more than a year after plaintiff filed his charge.  Defendant also

notes that the program was instituted as part of M&H Valve's conciliation agreement with the

E.E.O.C. arising from the charges filed by plaintiff and other employees.  Because plaintiff has

not filed a charge of discrimination relating to M&H Valve's supervisory training program,

defendant asserts, he has not exhausted his administrative remedies with regard to such a claim.

Accordingly, defendant argues, it is entitled to summary judgment as to any such claim under

Title VII.

### 2.      Plaintiff's Disparate Impact Claim Under Section 1981.

Defendant also contends that it is entitled to summary judgment with regard to any

disparate impact claim under Section 1981, as disparate impact claims do not exist under the

statute.  Defendant argues that Section 1981 "only provides a cause of action for claims involving

intentional discrimination."  *Cooper v. Southern Co.,* 390 F.3d 695, 723 (11th Cir. 2004).  *See*

*also General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391 (1982) (stating,

"[w]e conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by

purposeful discrimination"); *Brown v. American Honda Motor Co., Inc,* 939 F.2d 946, 949 (11th

Cir. 1991) (stating, "Section 1981 requires proof of intentional discrimination").  Defendant

argues, "[a] showing of disparate impact through a neutral practice is insufficient to prove a §

1981 violation because proof of discriminatory intent is essential.  Accordingly, only direct or

inferential modes of proving intentional discrimination are available to the § 1981 plaintiff."

*Ferrill v. Parker Group, Inc.,* 168 F.3d 468, 472 (11th Cir. 1999).[9]

---

[9] Even without this precedent precluding a disparate impact claim under Section 1981,
defendant maintains it would still be entitled to summary judgment on such a claim here.
Specifically, defendant argues, plaintiff has not and cannot meet his prima facie burden for

### 3.     Plaintiff's Failure-to-Train Claim.

According to defendant, other than the supervisory training program, plaintiff has failed to identify any training that he was denied but that was given to white employees.  Therefore, defendant concludes, it is entitled to summary judgment with regard to plaintiff's failure to train claim.

### C.     Information Relating to Plaintiff's Disparate Impact/Failure to Train Claims.

### 1.     Who Has the Burden to Establish That the Test Does or Does Not Have a Discriminatory Impact on African-Americans?  What Must Be Proved?  How?

According to defendant, plaintiff bears the burden of establishing that M&H Valve's use of the TABE test to screen applicants for its supervisory training program has a discriminatory disparate impact against African-American employees.  Defendant argues that plaintiff's initial burden is to establish a prima facie case of disparate impact discrimination by showing that: "(1) there is a significant statistical disparity among members of different racial groups; (2) there is a specific, facially-neutral employment policy or practice; and (3) there is a causal nexus between the specific policy or practice and the statistical disparity."  *Cooper v. Southern Co.,* 390 F.3d 695, 724 (11th Cir. 2004).[10]  With regard to the first element of this prima facie case, defendant contends, "plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of

_____

showing disparate impact discrimination in connection with the TABE entrance examination to M&H Valve's supervisory training program.  According to defendant, plaintiff has failed to show a "significant statistical disparity among members of different racial groups" as required for a prima facie case.  *Cooper v. Southern Co.,* 390 F.3d 695, 724 (11th Cir. 2004).

[10] Defendant notes that the burden-shifting framework for disparate impact claims is derived from the text of 42 U.S.C. § 2000e-2(k).

8

their membership in a protected group." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 977 (1988).

If plaintiff can make out a prima facie case, defendant maintains, then the burden shifts to M&H Valve to establish that the practice serves a legitimate, non-discriminatory business objective. *E.E.O.C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1275 (11th Cir. 2000). Finally, defendant asserts, if it meets its burden in the second stage, plaintiff must prove that an alternative, non-discriminatory practice would have served M&H Valve's stated objective equally as well. *Id.*

According to defendant, plaintiff has fallen well short of establishing a prima facie case of disparate impact discrimination relating to the TABE test because he has failed to provide the court with a statistical analysis as required under *Watson*. Moreover, defendant argues, even if plaintiff could make the required statistical showing that the TABE test has a disparate impact, M&H Valve has shown that its testing policy serves a legitimate, non-discriminatory business objective. Defendant points to Baldwin's testimony that, based on M&H Valve's management's knowledge of the requirements of the supervisory positions, the company determined that a tenth-grade equivalency on the TABE would be a satisfactory level at which to begin the training program. (Baldwin Supp. Decl. ¶ 6). Baldwin further stated that the company's management believed that the tenth-grade testing requirement would allow a diversity of candidates to enter the program, while eliminating candidates who lacked the educational skills to complete the intense nine-month program, the cost of which was approximately $24,000 per student for the 15 students who enrolled. (*Id.*)

Defendant maintains that plaintiff has not and cannot prove that an alternative to the

9

tenth-grade testing requirement would have served M&H Valve's stated purpose as well.  In fact, defendant asserts, plaintiff has not even attempted to suggest an alternative practice, much less show that such a practice would satisfy M&H Valve's stated objectives.  Defendant notes that plaintiff's highest test score placed him at the fifth-grade level, and that dropping the testing requirement to this level would not serve its objectives.  Clearly, defendant argues, it could not be expected to pay to train someone in a rigorous academic setting who cannot test better than an average fifth-grader.

      **2.**     **What Percentage of Whites Who Have Taken the Test Passed?  What Percentage of African-Americans Who Have Taken the Test Passed?**

Defendant highlights the testimony of Raymond P. McClay ("McClay"), Personnel Manager for M&H Valve in Anniston, Alabama.  McClay testified that, as of March 22, 2005, 79% of the white M&H Valve employees who have taken the TABE have scored at a tenth-grade level or higher.  (McClay Decl. ¶ 4).  Of the African-Americans who took the test, 38% have scored at a tenth-grade level or higher.  (*Id.*)  According to McClay, of all the employees who have taken the TABE test, plaintiff has scored the lowest, testing at the 3.8 and 5.0 grade levels on his two attempts.  (*Id.*)

      **3.**     **Has the E.E.O.C. Approved the Test?**

Defendant contends that the E.E.O.C. was provided with a description of the supervisory training program before it was implemented.  However, according to defendant, the E.E.O.C. did not expressly approve or disapprove of the testing requirement.

      **4.**     **Does the Same Test Apply to All Supervisory Positions?  Appropriately So?**

Defendant states that the test does not apply to all supervisory positions.  To the contrary,

defendant asserts, passing the M&H Valve supervisory training program is not a prerequisite to receiving a promotion to a supervisory position at the company.  Moreover, defendant acknowledges, there is no requirement that an applicant for a supervisory position pass the test used to select applicants for the program.  Defendant points to Baldwin's testimony that the purpose of the program is to allow interested and qualified employees the opportunity to enhance the skills necessary for advancement.  (Baldwin Supp. Decl. ¶ 4).  According to defendant, the mere fact that an employee has completed the program does not entitled that employee to become a supervisor.  Similarly, the fact that an employee has not participated in the program does not preclude that employee from becoming a supervisor if he or she is the most qualified applicant for the position.

> **5.**    **What Evidence Is There of Training Offered to Whites and Not African-Americans Before this Testing Procedure Was Established. Any Data on the Relative Numbers?**

Defendant maintains that plaintiff has failed to identify any training that was denied to him, other than the supervisory training program.  According to defendant, plaintiff has not developed, through discovery or otherwise, any evidence regarding the training provided to other employees at M&H Valve, whether white or black.

**II.    Plaintiff's Response.**

> **A.    Plaintiff's Disparate Impact/Failure to Train Claims.**

> > **1.    Who Has the Burden to Establish That the Test Does or Does Not Have a Discriminatory Impact on African Americans?  What Must Be Proved?  How?**

Plaintiff acknowledges that, to establish a prima facie case of disparate impact discrimination, he must prove that defendant uses a particular employment practice that causes

the disparate impact on the basis of race.  42 U.S.C. § 2000e-2(k)(1)(A)(i).

       **2.**       **What Percentage of Whites Who Have Taken the Test Passed?  What Percentage of African-Americans Who Have Taken the Test Passed?**

Plaintiff highlights the following deposition testimony of Baldwin concerning M&H

Valve's supervisory training program:

      Q:      How many M&H employees are currently taking part in the schooling?
      A:      Eight.
      Q:      Are any of those eight African American?
      A:      No.

(Baldwin Depo., p. 43).

      Q:      How come there's only eight in it?
      A:      Because the others didn't either decide to attend, dropped out, for whatever reason weren't able to complete the course material.
      Q:      Did it start with 15?
      A:      My recollection is that it did start with 15.
      Q:      Where any of the seven who ended up not making it this far for whatever reason African American employees?
      A:      Yes.
      Q:      How many?
      A:      Two.

(*Id.* at pp. 48-49).  Plaintiff asserts that he does not know how many employees took the TABE

or what percentage of African-American employees passed the test.

Plaintiff acknowledges the same burden shifting framework for establishing a

discriminate impact claim as discussed above.  Plaintiff notes Baldwin testified that he was

involved in developing the testing curriculum:

      Q:      Did you develop the testing criteria?
      A:      What do you mean?
      Q:      Well, in deciding to test for math comprehension, spelling comprehension, language and reading comprehension?
      A:      Yes.

(Baldwin Depo., p. 45).  According to plaintiff, Baldwin could not give a legitimate business-related reason for the testing requirement:

> Q:      . . . Did M&H or any of the other folks, the consultants, the school,
> undertake any kind of studies or review any kind of research to, let's say,
> start with the testing criteria to determine if the testing criteria had a
> reasonable relationship to the job that was to be filled, the supervisory job
> to be filled?
>
> A:      I don't know.  I don't know of any studies or research that was done into
> that.
>
> Q:      What about with regards to the development of the curriculum?  Was there
> any research that was reviewed or studies done to determine whether or
> not the curriculum had a reasonable relationship to the supervisory
> position?
>
> A:      I don't know of any studies or research that was done in that, other than
> basically the consultant and us talking with the schools to determine that
> does the time management course have application to a supervisor?  And it
> seemed fairly easy to make the leap that it did.

(*Id.* at p. 50).

### 3.      Has the E.E.O.C. Approved the Test?

Plaintiff highlights Baldwin's following testimony:

> Q:      Did the curriculum have to be approved by the Equal Employment
> Opportunity Commission?
>
> A:      I don't believe it did, but I believe we sent them a copy of it.

(Baldwin Depo., p. 43).

According to plaintiff, the E.E.O.C. has developed a detailed set of guidelines setting

forth the agency's application of disparate impact analysis to written tests and other employee

selection procedures.  29 C.F.R. § 1607.1, *et seq.*  Plaintiff notes that 29 C.F.R. § 1607.15

requires documentation of impact and validity evidence from employers with more than 100

employees like M&H Valve.[11]  Under 29 C.F.R. § 1607.15B, plaintiff points out, "[r]eports of criterion-related validity for a selection procedure should include the following information:" (1) users, locations, and dates of study; (2) "[a]n explicit definition of the purpose(s) of the study and the circumstances in which the study was conducted"; (3) job analysis or review of job information; (4) job titles and codes; (5) criterion measures; (6) descriptions of how the research sample was identified and selected; (7) descriptions of selection procedures; (8) methods used in analyzing data; (9) the selection procedures investigated and available evidence of their impact; and (10) the methods considered for use of the selection procedure and available evidence of their impact.  Further, under 29 C.F.R. § 1607.15B, employers should (11) "maintain records showing all pertinent information about individual sample members and raters where they are used, in studies involving the validation of selection procedures," and include in the reports (12) "[t]he name, mailing address, and telephone number of the person who may be contacted for further information about the validity study," and (13) a description of "the steps taken to assure the accuracy and completeness of the collection, analysis, and report of data and results."

Plaintiff maintains that Baldwin's testimony shows that M&H Valve did not perform a validation study regarding the selection process for the company's supervisory training program or regarding the program itself.  Further, plaintiff contends, 29 C.F.R. § 1607.9 provides that

---

[11] 29 C.F.R. § 1607.15A begins with:

> Required information. Users of selection procedures other than those users complying with section 15A(1) [employers with 100 or fewer employees] below should maintain and have available for each job information on adverse impact of the selection process for that job and, where it is determined a selection process has an adverse impact, evidence of validity as set forth below. . . .

there is no assumption of validity with regards to tests or other selection procedures.

> **4.     Does the Same Test Apply to All Supervisory Positions? Appropriately So?**

Plaintiff draws the court's attention to the following testimony of Baldwin:

> Q:     And I understand it, that prior to October 2002 – or let's say prior to the implementation of the conciliation agreement, there was no written criteria utilized by M&H for selecting a supervisor?
> A:     That's correct.
> Q:     How did the process change after implementation of the conciliation agreement?
> A:     It changed primarily in the fact that we posted supervisory openings for employees within the department, within the plant to indicate their interest on.
> Q:     Were there any other changes other than that?
> A:     We implemented a school for individuals who might be interested in– or who were interested or would be interested in attending a supervisory course.  And we did the same in terms of the posting for leadman.

(Baldwin Depo., pp. 39-40).

> **5.     What Evidence Is There of Training Offered to Whites and Not African-Americans Before this Testing Procedure Was Established. Any Data on the Relative Numbers?**

Plaintiff highlights the following statement made by Baldwin regarding this issue:

Q:     Before that conciliation agreement was implemented by M&H, tell me, how did M&H select a supervisor internally and promote from within?
A:     The line management would have had input into – well, would have input into that in suggesting employees, qualified employees for that particular job.

(Baldwin Depo., p. 37).

Plaintiff argues that, given the subjective nature of M&H Valve's selection process, it is

highly doubtful that any documentation was maintained on the relative numbers of employees

offered training.  Plaintiff points out that the only training he received in his 31 years of

employment with M&H Valve was a four-year apprenticeship in the 1980's.  (Price Depo., pp.

15

92-94).

Plaintiff points to an incident described in the affidavit testimony of Jerry Summerlin, an M&H Valve employee, as an example of M&H Valve's alleged practice of denying training to African-Americans.  Summerlin testified that, in January 2001, he told his supervisor, Chuck Yeager, that he wished to be trained on the company's "Robot MX60 MA50 machines." (Summerlin Affid.).  Approximately eight weeks later, Summerlin had not received such training, and he again approached Yeager.  (*Id.*)  Yeager informed Summerlin that department manager Mike Fulmer would not allow Summerlin to undergo the training.  (*Id.*)  However, Summerlin testified, five employees, all white, were allowed to train on these machines.  (*Id.*)[12]

B.     **Plaintiff's Failure to Promote Claim Regarding the Position Awarded to Nance.**

Plaintiff acknowledges that his E.E.O.C. Charge does not mention any specific positions about which he was complaining of a failure to promote.  Plaintiff highlights the language of the charge.  *See supra.*  Regarding the date of hire for Nance, plaintiff draws the court's attention to Baldwin's testimony that he could not remember if Nance was hired during 2000 or 2001. (Baldwin Depo., pp. 19-20).

## CONCLUSIONS OF THE COURT

As to the Nance promotion claim, in the absence of an acknowledgement by the plaintiff that Nance's hire date was August 23, 1999 and that, thus, any such claim is time barred, the court will deny the motion as to that claim and sever the statute of limitations issue and set that

---

[12] In further support of his argument that defendant refused training to African-American employees, plaintiff has produced E.E.O.C. Charge questionnaires for himself and four other African-American employees of defendant.

16

issue for trial.

Since there has been no E.E.O.C. charge filed with respect to discriminatory impact as to supervisory training or training in general, any purported Title VII claim(s) as to training will be dismissed.

Further, § 1981 does not provide a basis for a discriminatory impact claim.  In *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375 (1982), the Supreme Court examined the legislative history of § 1981 and stated:

> Our conclusion that § 1981 reaches only purposeful discrimination is supported by one final observation about its legislative history. As noted earlier, the origins of the law can be traced to both the Civil Rights Act of 1866 and the Enforcement Act of 1870. Both of these laws, in turn, were legislative cousins of the Fourteenth Amendment. The 1866 Act represented Congress' first attempt to ensure equal rights for the freedmen following the formal abolition of slavery effected by the Thirteenth Amendment. As such, it constituted an initial blueprint of the Fourteenth Amendment, which Congress proposed in part as a means of "incorporat[ing] the guaranties of the Civil Rights Act of 1866 in the organic law of the land." *Hurd v. Hodge*, 334 U.S., at 32, 68 S.Ct., at 851.  The 1870 Act, which contained the language that now appears in § 1981, was enacted as a means of enforcing the recently ratified Fourteenth Amendment. In light of the close connection between these Acts and the Amendment, it would be incongruous to construe the principal object of their successor, § 1981, in a manner markedly different from that of the Amendment itself.

> With respect to the latter, "official action will not be held unconstitutional solely because it results in a racially disproportionate impact," *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264-265, 97 S.Ct. 555, 562-563, 50 L.Ed.2d 450 (1977). "[E]ven if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The same Congress that proposed the Fourteenth Amendment also passed the Civil Rights Act of 1866, and the ratification of that Amendment paved the way for the Enforcement Act of 1870. These measures were all products of the same milieu and were directed against the same evils. Although Congress might have charted a different course in enacting the

17

predecessors to § 1981 than it did in proposing the Fourteenth Amendment, we have found no convincing evidence that it did so.

We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination.

458 U.S. at 389-91 (footnotes omitted) (emphasis added).

In *Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004), the Eleventh Circuit stated:

As we have observed, the plaintiffs claimed racial discrimination under three distinct Title VII theories: pattern and practice discrimination, disparate treatment discrimination, and disparate impact discrimination. *See* [*E.E.O.C. v.*]*Joe's Stone Crab*, [*Inc.*] 220 F.3d [1263,] 1273 [(11th Cir. 2000)]. The first two theories require the plaintiffs to prove discriminatory intent; the third does not. *Id.* The plaintiffs also assert claims under Section 1981, which, unlike Title VII, only provides a cause of action for claims involving intentional discrimination. *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Brown* [*v. American Honda Motor Co., Inc.*], 939 F.2d [946,] 949 [(11th Cir. 1991)].

390 F.3d at 723 (emphasis added).

To state a claim under a disparate impact theory, in contrast, a plaintiff need not establish that he suffered intentional discrimination. Rather, "disparate impact theory prohibits neutral employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group." [*Joe's Stone Crab*, 220 F.3d] at 1274. We have noted that the disparate impact theory is "a doctrinal surrogate for eliminating unprovable acts of intentional discrimination hidden innocuously behind facially-neutral policies or practices." *Id.*

*Id.* at 724 (internal citations omitted) (emphasis added).

In *Ferrill v. Parker Group, Inc.,* 168 F.3d 468 (11th Cir. 1999), the Eleventh Circuit

further stated:

Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts. *See, e.g., Johnson v. Railway Express Agency*, 421 U.S. 454, 459-460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) (holding unequivocally that § 1981 protects against racial discrimination in private employment). Section 1981 liability must be

18

founded on purposeful discrimination. *See General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982); *Lincoln v. Board of Regents of Univ. System of Ga.*, 697 F.2d 928, 935 n. 6 (11th Cir.1983).

A showing of disparate impact through a neutral practice is insufficient to prove a § 1981 violation because proof of discriminatory intent is essential. *See General Bldg. Contractors Ass'n*, 458 U.S. at 388, 102 S.Ct. at 3149 (recognizing that the drafters of § 1981 were not concerned with practices that were facially neutral); *Lincoln*, 697 F.2d at 935 n. 6. Accordingly, only direct or inferential modes of proving intentional discrimination are available to the § 1981 plaintiff. *See Larkin v. Pullman-Standard Div., Pullman, Inc.*, 854 F.2d 1549, 1561 (11th Cir.1988), *overruled on other grounds by Swint v. Pullman-Standard, Inc.*, 493 U.S. 929, 110 S.Ct. 316, 107 L.Ed.2d 307 (1989) (where plaintiff proceeded on a theory of disparate impact, plaintiff is limited to Title VII and cannot seek the broader § 1981 remedies and longer liability period). *Cf. Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir.1985) (where plaintiff claims only disparate treatment under both Title VII and § 1981, courts may analyze claims together).

168 F.3d at 472 (emphasis added).

This 30th of March, 2005.



_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**